# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **SALVADOR ROBLES, JORGE AVALOS, JOSE MARQUEZ, and CARLOS BARILLAS, individually and on behalf of others similarly situated,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 2:15-cv-2228-SHM-tmp** |
| **Plaintiffs,** | |
| **v.** )<br>) | |
| **COMTRAK LOGISTICS, INC., et al.,** )<br>)<br>)<br>) | |
| **Defendants.** | |

---

## PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF
## CLASS ACTION SETTLEMENT

---

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL & PROCEDURAL BACKGROUND ................................................... 1

  A.  Plaintiffs' Class Action Labor and Employment Claims ...................................... 1

    1.  The Pleadings and Defendants' Motions to Dismiss .................................... 1

    2.  Comtrak Settles with Individual Putative Class Members ............................. 3

    3.  Comtrak's Motion to Change Venue ............................................................ 3

    4.  The Second Amended Complaint & Defendants' Motion to Dismiss ............ 3

    5.  The Operative Third Amended Complaint ..................................................... 4

  B.  The Concurrent California Private Attorney General Act ("PAGA") Action .......... 4

  C.  Global Mediation, Continued Negotiations, and Eventual Settlement ................ 5

    1.  The Parties' Global Settlement Efforts ........................................................ 5

    2.  The Settlement Agreement .......................................................................... 7

    3.  Preliminary Approval of the Settlement ....................................................... 10

    4. The Settlement Notice Process Following Preliminary Approval ................... 10

III.  THE COURT PROPERLY CERTIFIED THE SETTLEMENT CLASSES ................... 11

IV.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT ......... 11

  A.  Class Representatives and Counsel Adequately Represented The Class ............ 12

  B.  The Proposed Settlement Was Negotiated at Arm's Length ............................. 13

  C.  The Relief Provided for the Class is Adequate ................................................. 14

    1.  The Costs, Risks, and Delay of Trial and Appeal ....................................... 15

    2.  The Effectiveness of Any Proposed Method of Distributing Relief to the Class,
        Including the Method of Processing Class-Member Claims ................................ 17

    3.  The Terms of the Requested Award of Attorney's Fees ................................ 18

    4.  Any Agreement Required to be Identified Under Rule 23(e)(3) ................... 18

  D.  The Proposal Treats Class Members Equitably Relative To Each Other ............ 19

V.   CONCLUSION ....................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aro Corp. v. Allied Witan Co.*,
    531 F.2d 1368 (6th Cir. 1976) ............................................................................... 11

*Dilts v. Penske Logistics, LLC*,
    769 F.3d 637 (9th Cir. 2014) ............................................................................... 2, 3

*Dynamex Operations West, Inc. v. Superior Court*,
    4 Cal.5th 903 (2018) ............................................................................................. 16

*Edwards v. City of Mansfield*,
    2016 WL 2853619 (N.D. Ohio 2016) ..................................................................... 11

*Gokare v. Fed. Express Corp.*,
    2013 WL 12094870 (W.D. Tenn. 2013) ................................................................. 11

*Granada Invsts., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) ............................................................................... 12

*In re Packaged Ice Antitrust Litig.*,
    2018 WL 4520931 (6th Cir. 2018) ........................................................................ 15

*Int'l Union v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ............................................................. 11, 12, 13, 14

*Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*,
    986 F.3d 841 (9th Cir. 2021) ................................................................................ 16

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ................................................................................ 12


**Statutes**

28 U.S.C. § 1291 .......................................................................................................... 6

Cal. Labor Code §2698, *et seq.* ................................................................................... 5

Cal. Labor Code §2699(i) ........................................................................................ 5, 9

Cal. Labor Code §2775, *et seq.* ................................................................................. 16


**Rules**

Fed. R. Civ. Proc. 23(a) ............................................................................................ 16

Fed. R. Civ. Proc. 23(b) ............................................................................................ 16

Fed. R. Civ. Proc. 23(c)(1)(C) .................................................................................. 16

Fed. R. Civ. Proc. 23(c)(2)(B) .................................................................................... 9

Fed. R. Civ. Proc. 23(e)(2) ............................................................................................... 12, 19

Fed. R. Civ. Proc. 23(e)(2) (C) (i) ......................................................................................... 17

Fed. R. Civ. Proc. 23(e)(2)(A) ............................................................................................... 13

Fed. R. Civ. Proc. 23(e)(2)(C) ............................................................................................... 15

Fed. R. Civ. Proc. 23(e)(2)(D) ............................................................................................... 19

**Regulations**

California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers,
83 Fed. Reg. 67470 (Dec. 28, 2018) ........................................................................ 16

## I.    INTRODUCTION

Representative plaintiffs Salvador Robles, Jorge Avalos, Jose Marquez, and Carlos Barillas ("*Representative Plaintiffs*"), on behalf of themselves and those similarly situated ("*Class Members*"), hereby respectfully request that this Court grant final approval of the class action settlement ("*Settlement Agreement*" or "*Settlement*") between Plaintiffs and defendants Hub Group Trucking Inc. (formerly Comtrak Logistics, Inc.) and Hub Group Inc. (collectively, "*Defendants*" or "*Comtrak*") pursuant to Federal Rules of Civil Procedure 23(e).

This Court granted preliminary approval of the Settlement on July 21, 2022. (Dkt. 183). Formal notice of the settlement in the form approved by this Court ("*Notice*") was mailed to all class members on August 15, 2022. (Romero Decl., ¶ 7). The objection and opt-out deadline passed on September 29, 2022. (*Id.*). In response to the Notice, the settlement administrator received one objection and one dispute regarding settlement payment, neither of which provided the required supporting information or documentation, and therefore neither of which are valid. (*Id.*, at ¶ 10). And, the objector subsequently withdrew his objection, and the other has not yet responded to inquiries from the settlement administrator or class counsel regarding the grounds for his objection/dispute. (*Id.*, at ¶ 11; Saltzman Decl., ¶35, Ex. 5). This response from Class Members - or lack thereof - is strong evidence that: (1) class members overwhelmingly support the pending Settlement, (2) the Settlement is just, fair, and reasonable, and (3) final approval should therefore be granted so the Parties and this Court can obtain closure with respect to this lengthy and hard-fought litigation.

## II.    FACTUAL & PROCEDURAL BACKGROUND

### A.    Plaintiffs' Class Action Labor and Employment Claims

#### 1.    The Pleadings and Defendants' Motions to Dismiss

Defendants hired California-based drivers for their freight shipping and trucking business, and classified those drivers as independent contractors. (Dkt. 57, at ¶ 5). Representative Plaintiff Robles filed this lawsuit against defendant Comtrak Logistics, Inc. on

January 25, 2013, in the United States District Court for the Eastern District of California, alleging twelve (12) causes of action premised on the alleged misclassification of Defendants' California-based drivers as independent contractors instead of employees. (Dkt. 1). Representative Plaintiff Robles alleged that because they were misclassified, they are owed considerable compensation for unpaid wages, missed meal and rest breaks, unreimbursed business expenses, and various other related statutory penalties and damages. (*See id.*, *generally*).

On May 16, 2013, Representative Plaintiff Robles filed his First Amended Complaint ("FAC") against defendant Comtrak Logistics, Inc., addressing issues raised by the Defendants in a motion to dismiss. (Dkt. 24). On June 3, 2013, Defendants filed a renewed motion to dismiss, challenging the FAC. (Dkt. 25). This motion was directed solely to the issue of whether the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") preempts California's Labor Code with respect to interstate drivers in California. (*See id.*).

The renewed motion to dismiss was fully briefed by the Parties in a timely manner, and on August 5, 2013, the Court issued an order staying all proceedings pending a ruling from the Ninth Circuit Court of Appeals on either of two separate and unrelated matters then pending before the appellate court, addressing the same FAAAA preemption issues raised in the motion to dismiss. (Dkt. 36). Both sides thereafter regularly submitted supplemental briefs with leave of Court, addressing pertinent issues that were evolving while the Parties were awaiting the Ninth Circuit's decision regarding the FAAAA preemption issue. (Dkt. 29-36, 43, 50-53).

On September 8, 2014, the Ninth Circuit Court of Appeals ruled on one of the two cases, *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 640 (9th Cir. 2014) ("*Dilts*"). The ruling was largely in favor of plaintiff truck drivers alleging similar misclassification claims, denied federal preemption, and permitted the claims in that case to proceed under California law. (*Id.*). Following *Dilts*, on December 19, 2014 – one and a half years after the motion to dismiss was filed – the Court issued its order denying Defendants' motion to dismiss the FAC. (Dkt. 54).

### 2.    Comtrak Settles with Individual Putative Class Members

On August 26, 2014 – six weeks after *Dilts*, and before the District Court issued its ruling on the motion to dismiss – Comtrak began a campaign of making individual settlement offers to putative class members. (Saltzman Decl., ¶3, fn. 1). The individual settlement agreements and releases ("***Individual Settlement(s)***") included consideration ranging from $3,000 to $45,000 based on the driver's tenure with Comtrak. (*Id.*).

The next day, Representative Plaintiffs filed an *ex parte* application seeking an order enjoining Comtrak's Individual Settlement efforts. (Dkt. 44). The Court denied this request, and as a result, Comtrak was permitted to continue making Individual Settlement offers to putative class members. (Dkt. 49). Over the period of about one week, ***Comtrak was able to reach settlements with 632 of the 682 class members, and paid a total of $9,087,000 to these 632 drivers, for an average settlement payment of $14,378 per driver.*** (Saltzman Decl., ¶3, fn. 1).

### 3.    Comtrak's Motion to Change Venue

On January 16, 2015, Comtrak moved to change venue under a venue-selection clause in the governing contracts. (Dkt. 59). On April 3, 2015, the United States District Court for the Eastern District of California granted Comtrak's motion to transfer this case to the United States District Court for the Western District of Tennessee, and shortly thereafter transferred the case to this Court (Dkt. 66 & 67).

### 4.    The Second Amended Complaint & Defendants' Motion to Dismiss

On May 15, 2015, Representative Plaintiffs filed their Second Amended Complaint ("***SAC***") against Defendants which included their original allegations and added allegations that the Individual Settlements were improper and should be invalidated. (Dkt. 86). In the SAC, Representative Plaintiffs pled that they brought this action on behalf of "[a]ll current and former California-based[1] truck drivers for Defendants, at any time from January 2009, to the present (the

---

[1] "California-based" refers to "Drivers: (i) who had a residential address in California at any time during the Class Period; and/or (ii) who were assigned or associated with a terminal in California at any time during the Class Period." (Dkt. No. 86 [SAC], at ¶ 144). The phrase "assigned or associated with a terminal" is defined to include "any and all Drivers listed in Defendants'

"Class Period") and who were classified by Defendants as independent contractors" ("**Class Members**") (Dkt. No. 86 [SAC], at ¶ 144).

On June 8, 2015, Defendants filed a motion to dismiss the SAC. (Dkt. 91). In their motion, Defendants: (1) again raised FAAAA preemption issues; (2) argued that Tennessee law should govern; (3) asserted that none of the California state law claims could survive under Tennessee law; and (4) asserted that the Individual Settlements were enforceable, and barred the "settlement class" from proceeding. (Dkt. 91 & 92). On July 19, 2016, this Court applied California law, denied most of the pleading-oriented challenges raised in the motion to dismiss, and ruled that the 632 Individual Settlements were valid and enforceable. (Dkt. 110). On August 11, 2016, Representative Plaintiffs filed a motion for reconsideration as to one particular issue therein, which this Court denied on July 2, 2018. (Dkt. 125).

### 5. The Operative Third Amended Complaint

On March 16, 2022, Plaintiffs filed their operative Third Amended Complaint ("TAC") with leave of Court to: (i) amend one of the subclass definitions to conform to developments in the case since the filing of the SAC, and (ii) to add a fourth Representative Plaintiff, Carlos Barillas, because Mr. Barillas filed his own lawsuit against Comtrak years ago, but dismissed it to be part of this case. (*See* Dkt. 175-177). The Class definition remained unchanged from the definition set forth in the SAC, but the Subclasses were amended to include: (1) the Robles Subclass, which is defined as all class members who did not execute releases of their claims in this action on or around and after August 27, 2014; and (2) the Settlement-Release Subclass (also referred to as the "Avalos/Marquez Subclass"), which is defined as all class members who executed releases of their claims in this action on or around and after August 27, 2014. (Doc. 177, at ¶¶ 143-144).

### B. The Concurrent California Private Attorney General Act ("PAGA") Action

On August 5, 2015, plaintiff Andres Adame (and others) filed a second action in California

---

database in connection with a terminal. (*Id.*).

state court under the California Private Attorneys General Act ("*Adame* PAGA Action"), asserting various claims as agents of California, acting for the benefit of both the state and a limited sub-group of drivers. (RJN, Ex. 1). Under PAGA, only state mandated penalties can be sought, with 75% of those penalties being paid directly to the state of California, and 25% going to the drivers. (Cal. Labor Code §2699(i)). No wage claims or failure to reimburse expense claims can be asserted in a PAGA action, other than to support statutory penalties therefore. (Cal. Labor Code §2698, *et seq.*). The filing of the *Adame* PAGA Action in California resulted in yet another a wave of motion practice, which took considerable time to resolve.[2]

On August 11, 2022, Plaintiffs filed a Motion for Approval of PAGA Settlement in the *Adame* PAGA Action, which is on calendar for November 30, 2022, at 10:00 a.m. before the Honorable David Cohn in Department S26 of the California Superior Court for the County of San Bernardino. (*See* RJN, Ex. 1).

### C.     Global Mediation, Continued Negotiations, and Eventual Settlement

#### 1.     The Parties' Global Settlement Efforts

When this Court issued its denial of Representative Plaintiffs' motion for reconsideration/leave to amend in July of 2018, coupled with the California Superior Court's denial of Defendants' expense preemption motion, the overall lay of the land on the substantive

---

[2] Defendants removed the PAGA case to the District Court for the Central District of California. (RJN, Ex. 1). Plaintiffs filed a timely motion to remand. (*Id.*). Defendants then filed a motion to transfer the case to this Court. (*Id.*). On April 7, 2016, the United States District Court for the Central District of California granted Plaintiffs' motion to remand and denied as moot the transfer motion. (*Id.*). The PAGA matter was then remanded to the California Superior Court for the County of San Bernardino. Defendants then filed multiple motions in the *Adame* PAGA Action: (1) seeking an order staying or dismissing the *Adame* PAGA Action; (2) seeking an order striking allegations in the PAGA complaint, and (3) demurring (the California state court equivalent to a 12(b)(6) motion to dismiss) to the entire action. (*Id.*). Following full briefing, oral argument, multiple rounds of supplemental briefing, and yet another hearing, class counsel (who is also counsel of record in the *Adame* PAGA Action) largely defeated these various motions. (*Id.*). This process took nearly a year. (*See id.*). In December of 2017, Defendants filed a motion for judgment on the pleadings in the *Adame* PAGA Action, seeking an order under the Federal Leasing Act ("FLA") regulations that the expense reimbursement claims asserted by the drivers were preempted by the FLA. (*Id.*). After yet further multiple rounds of briefing, and two hearings, the California Superior Court denied Comtrak's preemption motion in large part. (*Id.*).

issues was finally beginning to take shape. The misclassification claims of the fifty-one (51) drivers who had not accepted Individual Settlements were still alive, this Court had ruled that those claims would be adjudicated under California law, and the *Adame* PAGA Action was also proceeding. (*See* Dkt. 110; RJN, Ex. 1). The only potential avenue for relief for those drivers who had been found by this Court to have entered into binding Individual Settlements was their right to seek appellate review of that ruling in the United States Court of Appeals for the Sixth Circuit following the conclusion of this case, which would likely be extremely difficult to obtain. (*See* 28 U.S.C. § 1291).

Moreover, during the years these actions were pending, Defendants restructured their transportation operations in California, so that no owner-operator drivers were left in California. (Saltzman Decl., at ¶ 26, fn. 3). As a result, the damages exposure Defendants were facing was capped years ago by virtue of its business model restructuring. (*See id.*).

Against this backdrop of many years of procedural and substantive legal developments, and the reality of the effect of the Individual Settlements, along with the prospect of more years of litigation ahead of the Parties on two fronts, the Parties turned their efforts towards settlement. (Saltzman Decl., ¶ 2). In the Spring of 2019, Defendants agreed to produce mediation privileged data and information, relating to the fifty-one (51) non-settled drivers in this class action, as well as data necessary to evaluate the potential value of the *Adame* PAGA Action, wherein only penalties were being sought. (*Id.*, ¶ 3). Counsel for both sides voluntarily exchanged detailed legal memoranda relating to the many complex legal issues involved in both cases, and the impact of those issues on case valuations. (*Id.*, ¶ 5). This involved a serious effort by both sides to "debate" the issues still to be litigated. (*Id.*).

An in-person settlement meeting took place on August 9, 2019, in Chicago, involving lead counsel for both Parties, as well as Defendants' then General Counsel. (Saltzman Decl., ¶ 6). A full and frank discussion of all of the issues was carried on for many hours, including debates on the likelihood of Defendants prevailing on one or more of their preemption defenses, Representative Plaintiffs succeeding in obtaining and then holding onto a class certification

ruling, and then the possibilities of Representative Plaintiffs obtaining a favorable verdict at trial, and retaining it through appellate procedures. (*Id.*).

Ultimately, having been prepared by months of document review, data analysis, and many years of litigation, the Parties were able to reach what Representative Plaintiffs' counsel believes is a fair and reasonable settlement for the three relevant groups: (1) the *Robles* Subclass; (2) the *Avalos/Marquez* Subclass; and (3) the *Adame* PAGA Action drivers (with the *Adame* PAGA portion of the Settlement presented to the California court for approval). (Saltzman Decl., ¶ 8). While an agreement in principle was reached that day, the Parties continued to work for many months with ongoing negotiations dedicated to the details of this complicated Settlement, and then reducing that agreement to writing. (*Id.*, at ¶ 9).

Unfortunately, the very next week – as this Court was informed – the undersigned lead counsel for the Representative Plaintiffs began undergoing a full battery of medical tests, to address negative diagnostic numbers found that week during a routine medical exam, which were highly indicative of an eventual diagnosis of prostate cancer. (Saltzman Decl., ¶ 10). As it turned out, not only was that the diagnosis, but on August 30, 2019 – only three weeks following the meeting in Chicago – it was confirmed to be Stage 4 fully-metastasized prostate cancer, and thus extremely serious. (*Id.*). Thus, even accepting the difficulties that would normally ensue when trying to bring a complicated settlement like this to written form, it was further complicated by lead Class Counsel's serious health issues. (*Id.*).

## 2.    The Settlement Agreement

Conditional Certification of Two Subclasses for Settlement. The Settlement Agreement defines two subclasses for purposes of settlement (which the Court has already preliminarily certified, as discussed, as discussed *infra*): (1) all Class Members who <u>did not sign</u> an Individual Settlement agreement (the "***Robles Subclass***"), consisting of 51 Class Members; and (2) all Class Members who <u>signed</u> an Individual Settlement agreement (the "***Avalos/Marquez Subclass***"),

consisting of the remaining 632 Class Members.[3] (Saltzman Decl., ¶ 11, Ex. 1 [Settlement Agreement], at ¶¶ 11-14 & Exs. 1 & 2).

The *Adame* PAGA Action. The Settlement Agreement further contemplates that the California Superior Court for the County of San Bernardino will review and approve the portion of the Settlement allocated to the PAGA claims, which cover a third group of drivers: all persons who were classified as independent contractors between June 26, 2014 and September 30, 2014 (the "*Adame* **PAGA Drivers**") (356 drivers, all of whom are also members of either the Robles Subclass or the Avalos/Marquez Subclass). (Saltzman Decl., ¶ 11, Ex. 1, ¶¶ 12, 15 & Ex. 3). A motion for approval of the PAGA settlement was filed in the *Adame* PAGA Action on August 11, 2022, and is scheduled to be heard on November 30, 2022. (RJN, Ex. 1).

Settlement Amount and Allocation. Under the terms of the Settlement Agreement, Defendants will pay four million, seven-hundred and fifty thousand dollars ($4,750,000.00) to settle all claims raised in the pending litigation and the *Adame* PAGA Action. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 18). While the bulk of the settlement funds will be directed to the *Robles* Subclass, who have active and valuable claims, there is also a modest component of the Settlement funds being directed to the subclass made up of the drivers who signed Individual Settlement Agreements which were subsequently enforced by this Court. (*Id.*, ¶ 11, Exs. 1 & 2, at ¶ 19). Specifically, an allocation of the total Settlement amount is being directed to the Avalos/Marquez Subclass, to pay to them a 10% "bump" over whatever amount they accepted and received in their Individual Settlements years ago. (*Id.*). Thus, members of the Avalos/Marquez Subclass will receive a benefit commensurate with the deemed viability of any eventual post-trial appeal of this Court's Order enforcing the Individual Settlements. (*See id.*). In exchange for that 10% increase on the amount of their prior Individual Settlements, they will be releasing their right to seek appellate review in the Sixth Circuit of this Court's order upholding the validity of the Individual Settlements. (*Id.*, ¶ 11, Ex. 1, at ¶ 30 & 46). This is explained to the Avalos/Marquez Subclass in

---

[3] On July 21, 2022, this Court conditionally certified these two subclasses for purposes of settlement. (Dkt. 183).

the Notice previously approved by this Court. (Saltzman Decl., ¶ 11, Ex. 3).

Under the Settlement Agreement, one hundred and fifty thousand dollars ($150,000) will be allocated to the *Adame* PAGA Action, and will be distributed to the PAGA Drivers (25%) and the State of California (75%), as required under California law. (Saltzman Decl., ¶ 11, Exs. 1 & 2, at ¶ 19; Cal. Labor Code §2699(i)).

The Settlement Agreement further provides for a maximum combined total of $125,000 in gross service awards for the representative Plaintiffs, with the precise amount subject to Court approval upon final approval of the Settlement. (Saltzman Decl., ¶ 11, Exs. 1 & 2, at ¶ 19).

Finally, the Settlement amount is non-reversionary, so 100% will be paid to the intended recipient (and as a last resort, to California's unclaimed property fund in the intended recipient's name). (Saltzman Decl., ¶11, Ex. 1, at ¶ 45). All Class Members who did not opt-out of the Settlement will automatically receive their payments when the Settlement becomes final. (*Id.*).

Fairness and Reasonableness of the Settlement. The Parties and their experienced legal counsel agree that the terms and conditions of the Settlement are fair, reasonable, and in the best interests of all involved. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 43).

Class Notice. The Settlement contemplated that the Court review and approve the form Notice that is attached to the concurrently-filed Declaration of Stanley D, which this Court approved on July 21, 2022. (Saltzman Decl., ¶ 11, Ex. 3; Dkt. 183).

The Notice is in full compliance with Federal Rule of Civil Procedure 23(c)(2)(B) in that it constitutes "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." (Fed. R. Civ. Proc. 23(c)(2)(B); *see also* Saltzman Decl., ¶ 11, Ex. 3). Further, under the terms of the Settlement Agreement, the Notice was sent to each class member's last known address via United States mail, as updated by appropriate U.S. Postal Service searches, and clearly and concisely stated in plain, easily understood language: (i) the nature of the action; (ii) the definition of the classes certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member

who requests exclusion; (vi) the time and manner for requesting exclusion and/or objecting to the settlement; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). (Saltzman Decl., ¶ 11, Ex. 3; Fed. R. Civ. Proc. 23(c)(2)(B); Romero Decl., ¶7). Under the terms of the Settlement Agreement, the Notice was mailed to putative class members within fourteen (14) days of when this Court issued its order preliminarily approving the pending Settlement and Notice, and putative class members had forty-five (45) days to opt-out of the Settlement. (Saltzman Decl., ¶ 11, Ex. 1, at ¶¶ 38(a) & 40; Romero Decl., ¶7).

### 3.      Preliminary Approval of the Settlement

On March 24, 2022, Representative Plaintiffs filed their Unopposed Motion for an Order: (1) Certifying a Settlement Class and Two Subclasses; (2) Appointing Class Counsel; (3) Preliminarily Approving the Pending Settlement; (4) Approving the Proposed Class Notice Methods and Form; (5) Preliminarily Approving the Requested Fees, Costs, and Incentive Awards; and (6) Setting a Hearing Date for Final Approval ("***Preliminary Approval Motion***"). (Dkt. 178). On June 30, 2022, the Parties filed a Joint Motion for Status Conference. (Dkt. 179). On July 20, 2022, the Court held a status conference to discuss the pending Preliminary Approval Motion, after which it issued a minute order stating that a preliminary approval hearing was not necessary. (Dkt. 182). On July 21, 2022, this Court issued an order granting the Preliminary Approval Motion, in which it: (1) certified a settlement class with two subclasses, (2) appointed Marlin & Saltzman as class counsel, (3) preliminarily approved the settlement, (4) approved the class notice methods and form, (5) reserved judgment on the requested fees, costs, and incentive awards, and (6) set a hearing date for final approval. (Dkt. 183).

### 4.      The Settlement Notice Process Following Preliminary Approval

On or around August 4, 2022, the Parties transmitted the class lists to the settlement administrator. (Romero Decl., ¶5). On August 15, 2022, the settlement administrator mailed out the court-approved settlement notices to all 682 members of the pending classes, with a deadline of September 29, 2022 for individuals to exclude themselves and/or opt-out of the settlement. (*Id.*, at ¶7). Thirty-seven (37) notices were returned, traced, and re-mailed, and an additional twenty six

(26) notices were re-mailed for other reasons (*i.e.* class member request, etc.). (*Id.*, at ¶8). One notice was forwarded, and three notices were deemed undeliverable. (*Id.*, at ¶9). The settlement administrator received three responses from class members: (1) a request to update contact information, (2) an unsupported objection, and (3) a deficient dispute as to the amount of the settlement payment. (*Id.*, at ¶10). The individual who objected subsequently withdrew his objection. (Saltzman Decl., ¶ 35, Ex. 5). The settlement administrator reached out to the individual who submitted the deficient dispute, but that individual never returned the settlement administrator's call. (Romero Decl., ¶11).

## III.   THE COURT PROPERLY CERTIFIED THE SETTLEMENT CLASSES

Following preliminary approval, class certification is presumed to be reasonable, and "an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." *See Gokare v. Fed. Express Corp.*, No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094870, at *7 (W.D. Tenn. Nov. 22, 2013) (citations omitted). Here, there are no valid pending objections to this settlement by any class member.  Therefore, for the reasons set forth in the Plaintiffs' motion for preliminary approval, and as ordered by the Court in granting preliminary approval, the Robles Class and the Avalos/ Marquez Class were properly certified due to the Parties' satisfactory demonstration of numerosity, commonality, typicality, adequacy of representation by Class Counsel, predominance, and superiority.

## IV.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

The Sixth Circuit recognizes that the law favors the settlement of class action lawsuits. (*Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976)). Approval of a fair and reasonable settlement agreement promotes the public's interest in encouraging settlement of litigation. (*Edwards v. City of Mansfield*, 2016 WL 2853619 (N.D. Ohio May 16, 2016)). Indeed, the touchstone for final approval is the effect on the class as a whole in light of the particular circumstances, which includes the public policy of encouraging comprehensive settlement of class actions. (*See*

*Granada Invsts., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 910 (6th Cir. 1983)).

Under Rule 23(e)(2), district courts may approve a settlement upon a finding that the settlement is fair, reasonable, and adequate after considering whether:

"(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other."

In the Sixth Circuit, courts must also consider: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery completed; (4) the likelihood of success on the merits; (5) the opinion of class counsel and representatives; (6) the reaction of absent class members; and (7) public interest in the settlement ("*GM Factors*"). (*See Int'l Union*, 497 F.3d, at 631).[4]

### A.     Class Representatives and Counsel Adequately Represented The Class[5]

As set forth in detail above, Class Counsel and the Representative Plaintiffs fought hard for the rights of the putative class members at every stage of this litigation over many years. (*See* Section II, *supra*). Under the circumstances present here, the first factor – *adequacy of representation by class counsel and class representatives* – is clearly satisfied, as are the first and third *GM Factors* (*i.e.* no risk of fraud or collusion and adequate discovery completed prior to

---

[4] The *GM Factors* are discussed in detail in the following sections in the context of the factors identified by the legislature in Federal Rule of Civil Procedure 23(e).

[5] This section also addresses *GM Factor No. 1* (the risk of fraud or collusion) and *GM Factor No. 3* (the amount of discovery completed).

settlement). (*See* Fed. R. Civ. Proc. 23(e)(2) (A); *GM*, 497 F.3d, at 631).

**B.      The Proposed Settlement Was Negotiated at Arm's Length**

As set forth in detail in Section II (above), the Parties aggressively litigated this case for many years to properly inform and position themselves prior to engaging in settlement discussions. This included, *inter alia*: (1) ensuring that all major legal issues were resolved by the Courts prior to mediation so that the Parties had a realistic range of settlement values, (2) obtaining and analyzing substantial mediation privileged data and information to develop a fair and reasonable damages range, and (3) researching, drafting and exchanging detailed legal memoranda relating to the many complex legal issues involved in the case, and the impact of those issues on case valuations. (*See* Saltzman Decl., ¶¶ 2-5).

Once both sides were fully prepared to discuss settlement, an in-person settlement meeting took place on August 9, 2019, in Chicago, where the parties engaged in a full and frank discussion of all of the issues over the course of many hours, and all the legal and factual issues were addressed in a thorough and professional manner. (Saltzman Decl., ¶ 6). As set forth in the concurrently-filed Declaration of Stanley D. Saltzman, Class Counsel took their obligation to evaluate this case from a trial standpoint very seriously, and then based on decades of experience, converted that analysis into a reasonable settlement goal, taking into account the many risks of prevailing on class certification, at trial, and on appeal. (*Id.*, ¶ 7). Moreover, during the settlement negotiations, then General Counsel for Defendants fully participated in all of the discussions, and was fully engaged for the entire day. (*Id.*).

While an agreement in principle was reached that day, the Parties continued to work for many months negotiating and eventually agreeing to the details of this complicated class action and PAGA Settlement, and then reducing that agreement to writing. (Saltzman Decl., ¶9).

Under these circumstances, the second factor – *that the settlement was negotiated at arm's length* – is clearly satisfied, as are the related first and third *GM Factors* (*i.e.* no risk of fraud or collusion and adequate discovery completed prior to settlement). (*See* Fed. R. Civ. Proc. 23(e)(2) (A); *GM*, 497 F.3d, at 631).

**C.      The Relief Provided for the Class is Adequate**

In light of all the uncertainties present, the Settlement reached is abundantly fair and reasonable. On average, each of the drivers included in the *Robles* Subclass will be receiving approximately ***$1,061.08 gross for every week he or she drove for the Defendants***. (Saltzman Decl., ¶ 13). More specifically, ***the average gross payment to each Robles Class Member is $55,080.75, the highest is $237,774.92, and the lowest is $2,988.90***. (Romero Decl., ¶14). A recovery at that level is unusual, and Class Counsel respectfully submits that the Settlement is both strong and reasonable. (Saltzman Decl., ¶ 23). ***The average gross payment to each Avalos/Marquez Class Member is $1,137.95, the highest is $3,546.53, and the lowest is $236.44***. (Romero Decl., ¶15). These recovery statistics are before deductions for fees that will ultimately require Court approval, and normal costs, but are still extremely strong and substantial numbers.

Moreover, the Settlement was entered into only after Defendants ceased their practice of hiring independent contractor drivers in the state of California after the instant claims were raised by Representative Plaintiffs and Class Counsel, thus obviating any concerns arising from future misclassification California drivers. S*ee GM*, 497 F.3d, at 631 (***GM Factor No. 7*** (public interest in the settlement))).

Finally, class members overwhelmingly support the pending settlement as evidenced by extraordinarily low opt-out rate (0%) and objection rate (0.1%). (*See* Romero Decl., ¶10; *see also GM*, 497 F.3d, at 631 (***GM Factor No. 6*** (reaction of absent class members)).

Based on the foregoing, Class Counsel's experienced judgment, respectfully stated, is that the Settlement is an excellent result for all of those drivers who did not take the money in the early round of Individual Settlements offered by Defendants and instead pursued their claims in this lawsuit. (Saltzman Decl., ¶¶ 23; *see also GM*, 497 F.3d, at 631 (***GM Factor No. 5*** (the opinion of class counsel and representatives))).

As for those drivers who settled and had their claims dismissed subject only to possible appellate review, the modest "bump" of 10% allocated to these drivers whose settlements have previously been enforced by this Court is adequate, in light of: (1) the considerable amount of

compensation these drivers already received (totaling $9,087,000.00), and (2) the very low likelihood of success on appeal challenging the Individual Settlements. (Saltzman Decl., ¶ 24).

### 1.    The Costs, Risks, and Delay of Trial and Appeal

This factor – the relief provided for the class is adequate taking into consideration the costs, risks and delay of trial and appeal – is clearly satisfied here, and encompasses three of the *GM* Factors: (i) **GM Factor No. 2** (the complexity, expense and likely duration of the litigation), (ii) **GM Factor No. 4** (the likelihood of success on the merits), and (iii) **GM Factor No. 5** (the opinion of class counsel and representatives). *See* Fed. R. Civ. Proc. 23(e)(2)(C).

<u>First</u>, the risks of continued litigation are substantial in large part due to the constantly changing legal landscape with respect to several critical federal preemption issues. Thus, the controlling law for this case was never fixed; it was always a moving target for both sides, even when the Settlement was reached, and continuing thereafter. The relevant preemption issues include:[6]

1.    The impact of the Federal Aviation Administration Authorization Act ("FAAAA"), and whether or not it bars application of California employment laws in their entirety, as alleged by the Defendants here and by others in many ongoing cases in the trial courts, the mid-level appellate courts and the Supreme Court in California and perhaps, eventually, of the United States;

2.    The impact of the Federal Leasing Regulations ("FLR"), and whether they preempt most if not all of the expense reimbursement claims asserted, which have been critical to the Representative Plaintiffs' case, and have not yet been decided by the appellate courts; and

3.    On December 28, 2018, the federal Department of Transportation ("DOT") issued a revised Federal Motor Carriers' Safety Administration ("FMCSA") order

---

[6] These issues also serve to highlight the potential risks of non-recovery and the "real risk of complete non-recovery' if the action were to proceed to trial*." In re Packaged Ice Antitrust Litig.*, 2018 WL 4520931, at *6 (6th Cir. May 24, 2018).

addressing federal preemption issues. (*See* California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers, 83 Fed. Reg. 67470 (Dec. 28, 2018)). The legality of this new industry-favorable order has been the subject of appeals to the Ninth Circuit ever since its issuance in late 2018, and was actually argued and then ruled on by the Ninth Circuit, with the Ninth Circuit affirming its validity. (*See Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841 (9th Cir. 2021)). Still undecided, and pending in at least two appeals known to the Class Counsel, is whether or not the 2018 Order of the FMCSA will end up applying retroactively so as to eliminate the meal and rest break claims in this case, or whether it will be found to be only prospective in its force.

Second, the risks of continued litigation were further increased because the governing law within California on the question of independent contractor status has also been an ever-evolving issue throughout the pendency of this case. (*See e.g. Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018); Cal. Labor Code §2775, *et seq.* (effective September 4, 2020)). That issue has tended to evolve in a manner favorable to the employee claims, *if* those laws and decisions are not then themselves preempted by federal law. (*See id.*).

Third, the delay and risks of continued litigation were further increased because of the time-consuming nature and relatively high standard for obtaining and retaining class certification. (*See* Fed. R. Civ. Proc. 23(a), 23(b), 23(c)(1)(C)).

Fourth, this case has been pending since January 25, 2013. (Dkt. 1). Given the already over-burdened federal court system, and the added pressures and complications resulting from the pandemic, it is highly unlikely that a jury would be empaneled, and this case would proceed to trial any time soon. Moreover, depending on the outcome at trial, one or both sides would likely appeal. According to the United States Courts of Appeals Federal Court Management Statistics (June 30, 2021), the median time from filing a notice of appeal to disposition is 7.8 months in the

Sixth Circuit.[7] Plaintiffs and non-settling putative class members have already waited over eight (8) years for this case to work its way through the courts, and are eager to receive their Settlement funds as soon as possible. (*See* Dkt. 1).

Finally, if this case did not settle when it did, Representative Plaintiffs and Class Counsel would have incurred substantial additional costs, including *inter alia*: deposition fees, expert witness fees, trial preparation fees (*e.g.* exhibit binders, trial support services), travel expenses, etc., as well as considerable additional attorney time. (Saltzman Decl., ¶ 25).

Thus, when taking into account the risks, delay, and costs of trial and appeal, the relief provided for the class is adequate. (*See* Fed. R. Civ. Proc. 23(e)(2) (C) (i)).

## 2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class-Member Claims

Under the terms of the Settlement Agreement, the Parties jointly approved a settlement administrator. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 44). The Parties provided two lists (the *Robles* Subclass and the *Avalos/Marquez* Subclass) to the settlement administrator. (Romero Decl., ¶ 5; Saltzman Decl., ¶ 11, Ex. 1, at ¶ 38). These lists included, *inter alia*: the Class Members' full names, social security numbers, and last known addresses. (*Id.*).

The settlement administrator then processed and updated these lists utilizing the National Change of Address Database ("NCOA") maintained by the U.S. Postal Service, which contains changes of address filed with the U.S. Postal Service. (Romero Decl., ¶ 6; Saltzman Decl., ¶ 11, Ex. 1, at ¶ 38). The settlement administrator then sent the notices described above to the putative class members via U.S. Mail. (Romero Decl., at ¶7). If any notices were returned as undeliverable, the settlement administrator ran a "skip-trace" on the individual in an effort to locate an updated address, and if an updated address was located, re-sent the class notice, again, via U.S. Mail. (*Id.*, at ¶¶8-9). If the skip-trace does not reveal a more recent address, the settlement administrator re-sent the notice to the last known address. (*Id.*).

---

[7] Available at: https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables

Moreover, under the terms of the Settlement Agreement, this is an "opt-out" class, such that all Class Members will be included in the Settlement, and will receive the money owed to them under the terms of the Settlement Agreement unless they expressly opt-out of the Settlement. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 43). Putative class members had forty-five (45) days to opt-out of the Settlement, and could do so simply by signing, dating and mailing the notice to the settlement administrator. (*Id.*, at ¶ 11, Ex. 1, at ¶ 40). Thus, if a putative class member wished to be included in the Settlement, he or she did not have to do anything, and will simply receive a check for the Settlement amount owed to him or her upon final approval. (*See id.*).

### 3.   The Terms of the Requested Award of Attorney's Fees

Under the terms of the Settlement Agreement, Class Counsel will seek a modest award of attorneys' fees in the amount of ***twenty percent (20%)*** of the gross Settlement amount ($4,750,000), which totals ***$950,000*** in attorneys' fees. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 19). Fees are often sought in amounts of 25% or even 30-35%, but in an effort to drive as much of the Settlement funds to the Class Members, Class Counsel has elected to adjust the fee request to the unusually low 20% level. (Saltzman Decl., ¶ 26). Critically, this amount does not take into account: (1) substantial amounts Defendants previously paid to the 632 putative class members who settled their claims after this case was filed but before the current Settlement was reached ($9,087,000.00), as to which Class Counsel will receive no fee, and/or (2) the substantial non-monetary benefits associated with Defendants' decision to cease their allegedly illegal operations in California. (*Id.*). Moreover, the amount of fees sought will be subject to this Court approval pursuant to a noticed Motion for Attorneys' Fees and Costs filed concurrently herewith. (*Id.*, ¶ 27). Finally, Class Counsel will not be paid until the Class Members are paid. (*Id.*, at ¶ 28). Under these circumstances, the contemplated attorneys' fees are fair, just and reasonable.

### 4.   Any Agreement Required to be Identified Under Rule 23(e)(3)

True and correct copies of the Settlement Agreement and Amendment are attached as Exhibits 1 and 2 to the concurrently-filed Declaration of Stanley D. Saltzman. No other agreements related in any way to this litigation exist between the Parties or their counsel, and nothing of value

has been promised to any of the Representative Plaintiffs other than the requested incentive award, if approved by the Court (Saltzman Decl., ¶ 29).

### D.      The Proposal Treats Class Members Equitably Relative To Each Other

Rule 23(e)(2)(D) requires a court to determine whether the "proposal treats class members equitably relative to each other." For this factor, "[m]atters of concern could include whether the apportionment of relief among class members *takes appropriate account of differences among their claims*, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes.

As set forth in detail above, the Representative Plaintiffs seek certification of two distinct subclasses: (1) the *Robles* Subclass, whose members declined Defendants' Individual Settlement offers and refused to sign the Individual Settlement agreements offered to them by Defendants years ago, and thus have valid claims against Defendants; and (2) the *Avalos/Marquez* Subclass, whose members already signed Individual Settlement Agreements, received considerable monetary settlements ranging from $3,000.00 to $45,000.00 per driver, and waived all claims against Defendants.

With respect to the *Robles* Subclass – each class member will be paid based on the number of weeks he or she worked for Defendants during the relevant time period. (Saltzman Decl., ¶ 11, Ex. 1, at ¶ 47). Such a formula is inherently fair and equitable.

Because this Court previously upheld the validity of the Individual Settlement Agreements with putative class members, and because those drivers who accepted Defendants' Individual Settlement offers already received substantial monetary compensation and the benefit of Defendants' changed business practices, the *Avalos/Marquez* Subclass will get to keep any money already paid to them (ranging from $3,000.00 to $45,000.00 per driver), will receive an additional 10% "bump" in addition to any amounts already received, and will, in exchange, waive their right to challenge the validity or enforceability of their Individual Settlement Agreements. (Saltzman Decl., ¶ 11, Ex. 1, at ¶¶ 30 & 46). All members of this subclass will be treated the

19

same, and will receive the same proportional "bump" to the amount they already accepted to settle their claims. (*See id.*). Members of the *Avalos/Marquez* Subclass are therefore all being treated equitably vis-à-vis one another. (*See id.*).

## V.      CONCLUSION

For the reasons set forth above, Representative Plaintiffs respectfully request this Court grant this Motion.


DATED: November 3, 2022                    Respectfully submitted,
                                           **Marlin & Saltzman LLP**

                                           By:____/s/ Stanley D. Saltzman_____
                                           Stanley D. Saltzman
                                           California Bar No. 90058 (*pro hac vice*)
                                           29800 Agoura Road, Suite 210
                                           Agoura Hills, California 91301
                                           Phone: 818-991-8080
                                           Email: ssaltzman@marlinsaltzman.com

                                           *Attorney for Salvador Robles, Jorge Avalos, Jose*
                                           *Marquez, and Carlos Barillas*

**<u>CERTIFICATE OF COUNSEL</u>**

**<u>PURSUANT TO LOCAL RULE 7.2(a)(1)(B)</u>**

I, Stanley D. Saltzman, affirm that, after consultation between the parties to the controversy, all other parties are in agreement with the actions requested by way of this Motion. Specifically, on November 3, 2022, counsel for Defendants confirmed that Defendants do not intend on opposing this Motion.

<u>  s/ Stanley D. Saltzman</u>

## <u>CERTIFICATE OF SERVICE</u>

I, Stanley D. Saltzman, certify that I caused a true and correct copy of the foregoing document to be served upon counsel of record, via the Court's CM/ECF system, on November 3, 2022.

<u>  s/ Stanley D. Saltzman           </u>