IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| SALVADOR ROBLES, JORGE AVALOS, JOSE MARQUEZ, and CARLOS BARILLAS, individually and on behalf of others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   No. 15-cv-2228 ) |
| COMTRAK LOGISTICS, INC., HUB GROUP INC., HUB GROUP TRUCKING INC., and DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) |

ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES, COSTS,
AND INCENTIVE AWARDS

This is a class action in which it is alleged that Defendants, who operate a shipping and trucking business, misclassified their drivers as independent contractors in violation of California law. The parties came to a settlement, and this Court granted preliminary approval on July 21, 2022. (ECF No. 183.) Representative Plaintiffs Salvador Robles, Jorge Avalos, Jose Marquez, and Carlos Barillas filed their Unopposed Motion for Final Approval of Class Action Settlement ("Final Approval Motion") on November 3, 2022. (ECF No. 186.) On the same day, Representative Plaintiffs filed their Unopposed Motion for Approval of Attorneys' Fees, Costs, and Service Payments

from Class Action Settlement ("Fees Motion"). (ECF No. 187.) The Court held a fairness hearing to consider the motions on November 17, 2022. (ECF No. 188.) For the following reasons, the Motions are GRANTED.

## I. Factual and Procedural Background

### A. Plaintiffs' Class Action Labor and Employment Claims

#### 1. The Pleadings and Defendants' Motions to Dismiss

Defendants hired California-based drivers for their freight shipping and trucking business and classified those drivers as independent contractors. (ECF No. 57 at ¶ 5.) Representative Plaintiff Robles filed this lawsuit against Defendant Comtrak Logistics, Inc. ("Comtrak") on January 25, 2013, in the United States District Court for the Eastern District of California, alleging essentially that Comtrak should have classified its drivers as employees. (ECF No. 1.) Robles alleged that, because the drivers were misclassified, they are owed considerable compensation for unpaid wages, missed meal and rest breaks, unreimbursed business expenses, and various other related statutory penalties and damages. (See id.)

On May 6, 2013, Robles filed his First Amended Complaint ("FAC") against Comtrak addressing issues raised by Defendants in a motion to dismiss. (ECF No. 24.) On June 3, 2013, Defendants filed a renewed motion to dismiss directed solely to whether the Federal Aviation Administration Authorization Act of 1994

("FAAAA") preempted California's Labor Code with respect to interstate drivers in California. (ECF No. 25.)

The renewed motion to dismiss was fully briefed by the parties. On August 5, 2013, the Eastern District of California stayed all proceedings pending a ruling from the Ninth Circuit Court of Appeals on either of two separate cases then before the appellate court addressing the same FAAAA preemption issues raised in the motion to dismiss. (ECF No. 36.) Both sides thereafter regularly submitted supplemental briefs addressing pertinent issues that were evolving while the parties were awaiting the Ninth Circuit's decision on FAAAA preemption. (ECF Nos. 29-36, 43, 50-53.)

On September 8, 2014, the Ninth Circuit handed down _Dilts v. Penske Logistics, LLC_, 769 F.3d 637, 640 (9th Cir. 2014) ("_Dilts_"). The ruling largely favored plaintiff truck drivers with similar misclassification claims and denied federal preemption. _Id._ Following _Dilts_, on December 19, 2014, the Court denied Defendants' motion to dismiss the FAC. (ECF No. 54.)

### 2. Comtrak Settles with Individual Putative Class Members

On about August 27, 2014 -- six weeks after _Dilts_, and before the district court issued its ruling on the motion to dismiss -- Comtrak began a campaign of making individual settlement offers to putative class members. (ECF No. 192 at

3

¶ 6.) The individual settlement agreements and releases ("Individual Settlement(s)") included consideration ranging from $3,000 to $45,000 based on the driver's tenure with Comtrak. (Id.)

The next day, Representative Plaintiffs filed an ex parte application to enjoin Comtrak's Individual Settlement efforts. (ECF No. 44.) The court denied that request. (ECF No. 49.) Over a period of about a week, Comtrak was able to reach settlements with 632 of the 683 class members and paid a total of $9,087,000 to those 632 drivers, an average settlement payment of $14,378 per driver. (ECF No. 182 at 3.)

### 3. Comtrak's Motion to Change Venue

On January 16, 2015, Comtrak moved to change venue under a venue-selection clause in the governing contracts. (ECF No. 59.) On April 3, 2015, the Eastern District of California granted Comtrak's motion to transfer the case to the Western District of Tennessee. (ECF Nos. 66, 67.)

### 4. The Second Amended Complaint & Defendants' Motion to Dismiss

On May 15, 2015, Representative Plaintiffs filed their Second Amended Complaint ("SAC"), which added allegations that the Individual Settlements were improper and should be invalidated. (ECF No. 86.) Representative Plaintiffs pled that they brought this action on behalf of "[a]ll current and former

4

California-based[1] truck drivers for Defendants, at any time from January 2009, to the present (the 'Class Period') and who were classified by Defendants as independent contractors" (the "Class Members"). (ECF No. 86 at ¶ 142.)

On June 8, 2015, Defendants filed a motion to dismiss the SAC. (ECF No. 91.) In their motion, Defendants: (1) again raised FAAAA preemption issues; (2) argued that Tennessee law should govern; (3) asserted that none of the California state law claims could survive under Tennessee law; and (4) asserted that the Individual Settlements were enforceable and barred the "settlement class" from proceeding. (ECF Nos. 91, 92.) On July 19, 2016, this Court applied California law, denied most of the challenges raised in the motion to dismiss, and ruled that the 632 Individual Settlements were valid and enforceable. (ECF No. 110.) On August 11, 2016, Representative Plaintiffs filed a motion for reconsideration of one particular issue, which this Court denied on July 2, 2018. (ECF Nos. 113, 125.)

---

[1] "California-based" refers to drivers "(i) who had a residential address in California at any time during the Class Period; and/or (ii) who were assigned or associated with a terminal in California at any time during the Class Period." (ECF No. 86 at ¶ 142.) The phrase "assigned or associated with a terminal" is defined to include "any and all Drivers listed in Defendants' database in connection with a terminal." (Id.)

### 5. The Operative Third Amended Complaint

On March 16, 2022, Plaintiffs filed their operative Third Amended Complaint ("TAC") with leave of Court to: (i) amend one of the subclass definitions to conform to developments in the case since the filing of the SAC, and (ii) to add a fourth Representative Plaintiff, Carlos Barillas, because Barillas had filed his own lawsuit against Comtrak years ago but had dismissed it to be part of this case. (See ECF Nos. 175-177.) The class definition remained unchanged from the definition in the SAC, but the subclasses were amended to include: (1) the Robles Subclass, which is defined as all Class Members who did not execute releases of their claims in this action on or around and after August 27, 2014; and (2) the Settlement-Release Subclass (also referred to as the "Avalos/Marquez Subclass"), which is defined as all Class Members who executed releases of their claims in this action on or around and after August 27, 2014. (ECF No. 177 at ¶¶ 143-144.)

### B. The Concurrent California Private Attorney General Act ("PAGA") Action

On August 5, 2015, Plaintiff Andres Adame and others filed a second action in California state court under the California Private Attorneys General Act ("Adame PAGA Action"), asserting various claims as agents of California, acting for the benefit of both the state and a limited subgroup of drivers. (ECF No.

186-4, Ex. 1.) Under PAGA, only state mandated penalties can be sought, with 75% of those penalties paid directly to the state of California, and 25% to litigants. Cal. Lab. Code § 2699(i). No wage claims or failure to reimburse expense claims can be asserted in a PAGA action other than to support statutory penalties. See id. § 2699. The filing of the Adame PAGA Action in California resulted in another wave of motion practice, which took considerable time to resolve.[2]

**C. Global Mediation, Continued Negotiations, and Eventual Settlement**

**1. The Parties' Global Settlement Efforts**

After this Court's denial of Representative Plaintiffs' motion for reconsideration in July 2018, the only potential avenue for relief for those drivers who had entered into

---

[2] Defendants removed the PAGA case to the District Court for the Central District of California. (ECF No. 186-4, Ex. 1 at 23.) Plaintiffs filed a motion to remand. Defendants filed a motion to transfer the case to this Court. On April 7, 2016, the Central District of California granted Plaintiffs' motion to remand and denied as moot the transfer motion. The PAGA matter was then remanded to the California Superior Court for the County of San Bernardino. (Id.) Defendants subsequently filed in state court motions: (1) seeking an order staying or dismissing the Adame PAGA Action; (2) seeking an order striking allegations in the PAGA complaint, and (3) demurring (the California state court equivalent to a 12(b)(6) motion to dismiss) to the entire action. (Id., Ex. 1 at 20-22.) Following full briefing, oral argument, multiple rounds of supplemental briefing, and another hearing, the motions were largely denied. (Id., Ex. 1 at 8-20.) This process took nearly a year. (See id.) In December 2017, Defendants filed a motion for judgment on the pleadings in the Adame PAGA Action. (Id., Ex. 1 at 15-16.) After multiple rounds of briefing and two hearings, the California Superior Court denied Comtrak's preemption motion in large part. (Id., Ex. 1 at 12-20.)

Individual Settlements was their right to seek appellate review of this Court's ruling enforcing those settlement in the United States Court of Appeals for the Sixth Circuit. The misclassification claims of the fifty-one drivers who had not accepted Individual Settlements were still alive, and the Adame PAGA Action was also proceeding. During the years those actions were pending, Defendants restructured their transportation operations in California so that no owner-operator drivers remained in the state. (ECF No. 186-1 at ¶ 26, n.3.) As a result, the damages Defendants faced were capped because of the change to its business model.

Against this backdrop of many years of procedural and substantive legal developments, and the reality of the effect of the Individual Settlements, along with the prospect of more years of litigation on two fronts, the parties turned their efforts toward settlement. (Id. at ¶ 2.) In spring 2019, Defendants agreed to produce mediation privileged data and information about the fifty-one non-settled drivers, as well as data necessary to evaluate the potential value of the Adame PAGA Action. (Id. at ¶ 3.) Counsel for both sides voluntarily exchanged detailed legal memoranda addressing the many legal issues in both cases and the impact of those issues on case valuations. (Id. at ¶ 5.)

An in-person settlement meeting took place on August 9, 2019, in Chicago, in which lead counsel for both parties and

Defendants' then-General Counsel participated. (Id. at ¶ 6.) There was a full and frank discussion of the issues for many hours, including debates about the likelihood that Defendants would prevail on one or more of their preemption defenses, that Representative Plaintiffs would succeed in obtaining and holding onto a class certification ruling, and that Representative Plaintiffs would obtain a favorable verdict at trial and retain it through appeal. (Id.)

Having been prepared by months of document review, data analysis, and many years of litigation, the parties ultimately reached what Representative Plaintiffs' counsel asserts is a fair and reasonable settlement for the three relevant groups: (1) the Robles Subclass; (2) the Avalos/Marquez Subclass; and (3) the Adame PAGA Action drivers. (Id. at ¶ 8.) Although an agreement in principle was reached on the day of the settlement conference, the parties continued to work for many months establishing the details of the settlement and reducing their agreement to writing. (Id. at ¶ 9.)

### 2. The Settlement Agreement

Conditional Certification of Two Subclasses for Settlement. The Settlement Agreement defines two subclasses for purposes of settlement: (1) all Class Members who did not sign an Individual Settlement agreement (the "Robles Subclass"), consisting of 51 Class Members; and (2) all Class Members who signed an Individual

Settlement agreement (the "Avalos/Marquez Subclass"), consisting of the remaining 632 Class Members. (ECF No. 178-2 at ¶¶ 11-14.)

Settlement Amount and Allocation. Under the terms of the Settlement Agreement, Defendants will pay $4,750,000 to settle all claims raised in the pending litigation and the Adame PAGA Action. (ECF No. 178-2 at ¶ 12.) Although the bulk of the settlement funds will be directed to the Robles Subclass, who have active and valuable claims, a modest component of the fund will be directed to the subclass of drivers who signed Individual Settlement Agreements. (Id.) Specifically, the Avalos/Marquez Subclass is being paid a 10% "bump" over the amount they received in their Individual Settlements years ago. (Id.) In exchange for the 10% increase over the amount of their prior Individual Settlements, drivers in the Avalos/Marquez Subclass release their right to seek appellate review in the Sixth Circuit of the Court's order upholding the validity of the Individual Settlements. (Id. at ¶¶ 30, 46.) This was explained to the Avalos/Marquez Subclass in the Notice approved by the Court. (ECF No. 178-4.)

The Settlement Agreement provides for a maximum combined total of $125,000 in service awards for the Representative Plaintiffs. (ECF No. 178-2 at ¶ 19.)

The Settlement amount is non-reversionary; all funds will be paid to the intended recipient or, as a last resort, to

California's unclaimed property fund in the intended recipient's name. (Id. at ¶ 45.) All Class Members who did not opt-out of the Settlement will automatically receive their payments when the Settlement becomes final. (Id.)

The Adame PAGA Action. The Settlement Agreement allocates $150,000 to resolve the PAGA claims. Those funds are to be distributed to the PAGA drivers (25%) and the State of California (75%), as required by California law. ECF No. 178-2 at ¶ 19; Cal. Lab. Code § 2699(i). The PAGA provisions cover all drivers who were classified as independent contractors between June 26, 2014, and September 30, 2014 (356 drivers, all of whom are also members of the Robles Subclass or the Avalos/Marquez Subclass). (Id. at ¶ 12.)

On August 11, 2022, the parties moved the California Superior Court for the County of San Bernadino to approve the settlement. (ECF No. 186-4, Ex. 1 at 8.) The state court held a hearing on November 30, 2022 and issued an order approving the Settlement the same day. See Superior Court of California, County of San Bernadino, Court Case Information and Document Sales, Case No. CIVDS1511291, https://www.sb-court.org/divisions/civil-general-information/court-case-information-and-document-sales (last accessed Dec. 13, 2022).

Fairness and Reasonableness of the Settlement. The parties and their counsel agree that the terms and conditions of the

Settlement are fair, reasonable, and in the best interests of all involved. (ECF No. 178-2 at ¶ 22-29.)

<u>Class Notice.</u> The notice provided by the Settlement Agreement was approved by the Court on July 21, 2022. (ECF No. 183.) The notice fully complies with Federal Rule of Civil Procedure 23(c)(2)(B) in that it provides "individual notice to all members who can be identified through reasonable effort" and constitutes "the best notice that is practicable under the circumstances." The notice was sent to each Class Member's last known address via United States mail, as updated by appropriate U.S. Postal Service searches, and clearly states: (i) the nature of the action; (ii) the definition of the classes certified; (iii) the class claims, issues, or defenses; (iv) that a Class Member may enter an appearance through an attorney if the member desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion or objecting; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). (<u>See</u> ECF No. 178-4.)

### 3. Preliminary Approval of the Settlement

On March 24, 2022, Representative Plaintiffs moved for preliminary approval of the Settlement Agreement. (ECF No. 178.) The Court held a status conference on July 20, 2022, to discuss the pending motion and concluded that a preliminary approval

hearing was not necessary. (ECF No. 182.) The next day, the Court issued an order granting the preliminary approval motion, in which the Court: (1) conditionally certified a settlement class with two subclasses, (2) appointed Marlin & Saltzman as class counsel, (3) preliminarily approved the settlement, (4) approved the class notice methods and form, (5) reserved judgment on the requested fees, costs, and incentive awards, and (6) set a date for a final approval hearing. (ECF No. 183.)

### 4. The Settlement Notice Process Following Preliminary Approval

Beginning on August 4, 2022, the parties transmitted the class lists to the settlement administrator. (ECF No. 186-3 at ¶ 5.) On August 15, 2022, the settlement administrator mailed settlement notices to all Class Members, with a deadline of September 29, 2022, for individuals to object or opt-out of the settlement. (Id. at ¶ 7.) Thirty-seven notices were returned, traced, and re-mailed. (Id. at ¶ 8.) Following remailing, three notices were deemed undeliverable. (Id. at ¶ 9.) The settlement administrator received one objection and one dispute as to the amount of the settlement payment. (Id. at ¶10.) The individual who objected subsequently withdrew his objection. (ECF No. 186-1 at ¶ 35; ECF No. 186-2 at 94.) At the fairness hearing, counsel for Representative Plaintiffs represented that the settlement administrator had contacted the individual who had disputed the

amount of his settlement and that that individual had withdrawn his dispute. There are no pending objections or disputes about the settlement.

## II. Jurisdiction

The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). Under CAFA, federal courts have original jurisdiction of class actions in which: (1) any member of the putative class of plaintiffs is a citizen of a state different from any defendant; (2) the number of members of the putative class is at least one hundred; and (3) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2). Those requirements are met here.[3]

## III. Class Certification

Following preliminary approval, the approval of a class action settlement is generally presumed to be reasonable, and "an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." Levell v. Monsanto Research

---

[3] Although the parties decided to settle for $4,750,000 (i.e., less than the $5,000,000 threshold), "[t]he general rule is that 'if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.'" Metz v. Unizan Bank, 649 F.3d 492, 501 (6th Cir. 2011) (quoting Freeport McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991)); see also ECF No. 186-2 at 4. Plaintiffs alleged in their initial complaint that the aggregate value of putative Class Members' claims exceeded $5 million. (ECF No. 1 at ¶ 41.) That allegation is supported by the fact that the total value of Comtrak's Individual Settlements with drivers was more than $9 million. (See ECF No. 186-1 at ¶ 3 n.1.)

Corp., 191 F.R.D. 543, 550 (S.D. Ohio 2000). The Court conditionally certified Representative Plaintiffs' proposed class when it preliminarily approved the settlement. (ECF No. 183 at 22.) There are no pending objections. Therefore, for the reasons set forth in the Court's order granting preliminary approval, the Court finds that Representative Plaintiffs have satisfactorily shown numerosity, commonality, typicality, adequacy of representation by class counsel, predominance, and superiority. (Id. at 7-14.)

## IV. Final Approval of the Settlement

Sixth Circuit caselaw favors the settlement of class action lawsuits. UAW v. Gen. Motors Corp., 497 F.3d 615, 632 (6th Cir. 2007). Approving a fair and reasonable settlement agreement "promotes the public's interest in encouraging settlement of litigation." Edwards v. City of Mansfield, No. 1:15-CV-959, 2016 U.S. Dist. LEXIS 64159, at *10 (N.D. Ohio May 16, 2016). "The fairness of the settlement must be evaluated primarily based on how it compensates class members." Greenberg v. Procter & Gamble Co. (In re Dry Max Pampers Litig.), 724 F.3d 713, 720 (6th Cir. 2013) (emphasis removed) (quoting Synfuel Techs., Inc. v. DHL Express (USA), Inc., 643 F.3d 646, 654 (7th Cir. 2006)).

Under the Federal Rules of Civil Procedure, district courts may approve a settlement upon a finding that the settlement is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have
adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking
into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of
    distributing relief to the class, including the method
    of processing class-member claims;
    (iii) the terms of any proposed award of attorney's
    fees, including timing of payment; and
    (iv) any agreement required to be identified under
    Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to
each other.

Fed R. Civ. P. 23(e)(2).

In the Sixth Circuit, courts must also consider: (1) the
risk of fraud or collusion; (2) the complexity, expense and
likely duration of the litigation; (3) the amount of discovery
completed; (4) the likelihood of success on the merits; (5) the
opinion of class counsel and representatives; (6) the reaction
of absent class members; and (7) the public interest" (the "GM
Factors"). <u>Gen. Motors</u>, 497 F.3d at 631.

## A. Class Representatives and Counsel Adequately Represented the Class

Class counsel and the Representative Plaintiffs have
diligently prosecuted this case for nearly ten years. (<u>See</u> ECF
No. 1.) In that time, they have opposed multiple motions to
dismiss, engaged in extensive settlement negotiations, and
ultimately achieved a significant recovery on behalf of the
class. The absence of any objection evidences the Class Members'

satisfaction with the representation of their counsel and representatives. Under these circumstances, the first factor under the Rules of Civil Procedure -- adequacy of representation by class counsel and class representatives -- is clearly satisfied, as is the first GM Factor (i.e., no risk of fraud or collusion). See Fed. R. Civ. P. 23(e)(2)(A); Gen. Motors, 497 F.3d at 631; Leonhardt v. ArvinMeritor, Inc., 581 F. Supp. 2d 818, 838 (E.D. Mich. 2008) ("Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary.").

**B. The Proposed Settlement Was Negotiated at Arm's Length**

This case has been vigorously litigated by counsel on both sides for many years. The parties did not enter into settlement negotiations until after the resolution of multiple contested motions to dismiss. (See ECF Nos. 25, 29, 91, 95, 186-1 at ¶¶ 2-5.) On beginning their negotiations, the parties produced substantial mediation-privileged data, some going back more than five years, to develop a fair and reasonable damages range. (ECF No. 186-1 at ¶ 3.) The parties exchanged detailed legal memoranda addressing the many complex legal issues in the case and the impact of those issues on case valuations. (Id. at ¶ 5.)

The parties then held an in-person settlement meeting in which they engaged, over the course of many hours, in a discussion of all the pertinent issues, including but not limited

to the viability of a preemption defense and the likelihood of Representative Plaintiffs' obtaining a class certification ruling. (ECF No. 186-1 at ¶ 6.) General Counsel for Defendants participated in the meeting. (Id.) After reaching an agreement in principle, the parties continued to work for many months negotiating and reducing that agreement to writing. (Id. at ¶ 9.)

Under these circumstances, the second factor -- that the settlement was negotiated at arm's length -- is satisfied, as is the third GM Factor (i.e., adequate discovery completed prior to settlement). See Fed. R. Civ. P. 23(e)(2)(A); Gen. Motors, 497 F.3d at 631.

**C. The Relief Provided for the Class is Adequate**

The Settlement reached is fair and reasonable. On average and before any deductions, each of the drivers included in the Robles Subclass will be receiving approximately $1061.08 gross for every week he or she drove for Defendants. (ECF No. 186-1 at ¶ 13.) Assuming the Court grants all requested attorneys' fees, costs, and incentive awards, the settlement administrator estimates that the average payment to each Robles Subclass member will be $55,080.75, the highest will be $237,774.92, and the lowest will be $2,988.90. (ECF No. 186-3 at ¶ 14.) After attorneys' fees, costs, and incentive awards, the approximate average payment to each Avalos/Marquez Subclass member will be $1,137.95, the highest will be $3,546.53, and the lowest will be

18

$236.44. (Id. at ¶ 15.) These numbers represent a significant recovery for Class Members. The recovery for the Avalos/Marquez Subclass is in addition to the $9,087,000 already paid to that Subclass pursuant to the Individual Settlements.[4]

Although not a benefit provided directly by the agreement, the Settlement was entered into only after Defendants ceased hiring independent contractor drivers in the state of California. (ECF No. 186-1 at ¶ 26, n.3.) Representative Plaintiffs' lawsuit thus provided an additional benefit to Class Members in that it caused Defendants to change their allegedly unlawful business practices.

The fifth GM Factor, the opinions of class counsel and class representatives, favors the Settlement. Gen. Motors, 497 F.3d at 631. Class counsel opines that the Settlement provides an "outstanding result" for the Robles Subclass and that the Avalos/Marquez Subclass's recovery is "more than adequate" given the anticipated difficulty members of that subclass would have in an attempt to void their Individual Settlements. (ECF No. 186-1 at ¶¶ 23-24.) Representative Plaintiffs have also said they believe the Settlement is fair and reasonable. (ECF Nos. 178-7, 178-8, 178-9, 178-10.)

---

[4] There were 632 drivers who accepted Individual Settlements. (ECF No. 186-1 at ¶ 3 n.1.) The average payment was $14,378.16. The Individual Settlements ranged from $3000 to $45,000 based on the driver's tenure with Comtrak. (Id.)

Absent Class Members support the Settlement. Only one objection and one dispute about the payment amount were filed. (See ECF No. 186-3 at ¶ 10.) Both were subsequently withdrawn. (Id.) The sixth GM Factor, the reaction of absent class members, thus weighs in favor of approving the Settlement. See Gen. Motors, 497 F.3d at 631.

### 1. The Costs, Risks, and Delay of Trial and Appeal

Taking into consideration the costs, risks and delay of trial and appeal requires an analysis of Plaintiffs' legal claims, Defendants' potential defenses, the strength of each set of arguments, and the overall legal posture and circumstances of the litigation. When these factors are considered, the relief provided for the class is adequate, and GM Factors 2 (the complexity, expense and likely duration of the litigation) and 4 (the likelihood of success on the merits) are satisfied. See id.; Fed. R. Civ. P. 23(e)(2)(C)

First, the risks of continued litigation are substantial due to the uncertainty and changing legal landscape affecting several critical federal preemption issues. The relevant preemption issues include:[5]

---

[5] Because a successful preemption defense could prevent plaintiffs from recovering anything from Defendants, such a defense poses a "'real risk of complete non-recovery' if the action were to proceed." Indirect Purchasers v. Arctic Glacier, Inc. (In re Packaged Ice Antitrust Litig.), No. 17-2137, 2018 U.S. App. LEXIS 13882, at *14 (6th Cir. May 24, 2018) (unpublished).

1. Whether the FAAAA bars the application of California employment laws in their entirety, as alleged by Defendants. Although both this Court and the Eastern District of California have concluded that the FAAAA does not pre-empt California law, ECF No. 110 at 13-17, those rulings would be subject to reexamination on appeal. The outcome of such an appeal is not a foregone conclusion; the First Circuit has ruled that, in at least some circumstances, the FAAAA does preempt state employment laws. See, e.g., Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 436-40 (1st Cir. 2016).

2. Whether regulations under the Federal Leasing Act preempt expense reimbursement claims asserted in the Adame PAGA Action. (See ECF No. 186 at 5 n.2.)

3. Whether a 2018 order of the Federal Motor Carrier Safety Administration ("FMCSA") applies retroactively so as to eliminate the meal and rest break claims in this case. The FMCSA's December 28, 2018 order exercised the agency's authority to determine which state commercial motor vehicle safety laws are preempted and overrode California's meal and rest break rules. California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers, 83 Fed. Reg. 67,470 (Fed. Motor Carrier Safety Admin. Dec. 28, 2018); see also Int'l Brotherhood of Teamsters, Loc. 2785 v. Fed. Motor

Carrier Safety Admin., 986 F.3d 841, 845-46 (9th Cir. 2021). The Ninth Circuit upheld that order, Loc. 2785, 986 F.3d at 845-46, and also recently held (over a dissent) that the FMCSA's order applies retroactively, Valiente v. Swift Transp. Co. of Ariz., No. 21-55456, 2022 U.S. App. LEXIS 32424, at *3-4 (9th Cir. Nov. 23, 2022) (published). The retroactivity of the FMCSA's order would, however, be subject to litigation on appeal before the Sixth Circuit and, potentially, the Supreme Court. Absent a settlement, the issue is likely to generate further litigation, expense, and uncertainty.

Second, the risks of continued litigation are increased because California law governing independent contractor status is continually evolving. See Dynamex Operations W., Inc. v. Superior Ct., 416 P.3d 1, 7 (Cal. 2018) (modifying test for independent contractor status); Cal. Lab. Code § 2775 (partially adopting and partially modifying Dynamex). Frequent changes to controlling law, and the accompanying questions of retroactivity, increase the risk and uncertainty of litigation.

Third, class action litigation is time-consuming, and the standard for obtaining and retaining class certification is relatively difficult to satisfy. That increases the delay and risk associated with continued litigation. The inherent risk and difficulty of litigating as a class are further increased by the

numerosity of the class and the existence of a parallel state court action, both of which make a swift and decisive global settlement more desirable.

Fourth, although it is axiomatic that continuing to litigate imposes additional costs and leads to larger attorneys' fees, those expenses should not be ignored. If this case had not settled, Representative Plaintiffs would have incurred substantial additional costs, including deposition fees, expert witness fees, trial preparation fees, and travel expenses, as well as considerable additional attorney time. (See ECF No. 186-1 at ¶ 25.) The Settlement Agreement, in addition to providing a certain and significant recovery to the class, forecloses those additional costs.

Considering the risks, delay, and costs of trial and appeal, the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C)(i). The magnitude of the recovery for Class Members, the risk of non-recovery, and the financial and temporal costs of continued litigation also make the settlement in the public interest (GM Factor 7). See Gen. Motors, 497 F.3d at 631.

### 2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class-Member Claims

Considering the effectiveness of distributing funds to the class, the Settlement Agreement provides adequate relief. See Fed. R. Civ. P. 23(e)(2)(C)(ii). Under the terms of the

Settlement Agreement, the parties provided Class Members' full names, social security numbers, and last known addresses to the settlement administrator, who then processed and updated those lists using the National Change of Address Database maintained by the U.S. Postal Service. (ECF Nos. 186-2, Ex. 1 at ¶ 38, 186-3 at ¶ 6.) The settlement administrator sent the class notices to the putative Class Members via U.S. mail. (ECF No. 186-3 at ¶ 7.) If any notice was returned as undeliverable, the settlement administrator ran a "skip-trace" on the individual to locate an updated address, and if an updated address was located, the administrator re-sent the class notice via U.S. mail. (Id. at ¶¶8-9.)

The Settlement Agreement is an "opt-out" class. All Class Members will be included in the Settlement and will be paid automatically unless they expressly opt-out. (ECF No. 186-2, Ex. 1, at ¶¶ 42-43.) Putative class members who wished to opt-out had forty-five days to do so and needed only to sign, date, and mail notice to the settlement administrator. (Id. at ¶ 40.)

These procedures are reasonable and are likely to effectively distribute relief to the class, as shown by the fact that the settlement administrator was unable to find a valid address for only three of more than 630 Class Members. (ECF No. 186-3 at ¶ 9.)

24

### 3. The Terms of the Requested Award of Attorney's Fees

Class counsel seeks an award of $950,000 in attorneys' fees, which amounts to twenty percent of the gross settlement of $4,750,000. (ECF No. 187.) Class counsel has pursued this case since 2013 and invested approximately 1798 hours, representing a lodestar value of $1,388,650. (ECF Nos. 1, 186-1 at ¶ 28-29.) Under these circumstances, and for the reasons more fully discussed in this Order granting the Fees Motion, the contemplated attorneys' fees are fair, just and reasonable.

### 4. Any Agreement Required to be Identified Under Rule 23(e)(3)

The Settlement Agreement and Amendment have been submitted to the Court and are fully considered in this Order. (ECF No. 186-2.) Class counsel has filed a declaration saying that there are no other agreements relating to this litigation. (ECF No. 186-1 at ¶ 34.)

### D. The Proposal Treats Class Members Equitably Relative To Each Other

Before approving a class action settlement, a court must decide that the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The court should particularly evaluate "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment

of relief." Fed. R. Civ. P. 23(e)(2)(D), advisory committee's note to 2018 amendment.

Each member of the Robles Subclass will be paid based on the number of weeks he or she worked for Defendants during the relevant time period. (ECF No. 186-2 at 15.) That formula is inherently fair and equitable because it apportions relief according to the amount of time each driver was allegedly misclassified. This distribution scheme aligns payments with the claim size of each individual driver.

Because the Court has recognized the validity of the Individual Settlement Agreements, the members of the Avalos/Marquez Subclass will keep any money already paid to them. (Id. at 15, 51.) Those Individual Settlement payments were proportional to each driver's tenure with Comtrak. (ECF No. 186-1 at ¶ 3 n.1.) Under the Settlement, the Avalos/Marquez Subclass will receive a 10% "bump" in addition to any amounts already received in exchange for the waiver of any appellate challenge to the enforceability of their Individual Settlement Agreements. (ECF No. 186-2 at 15.) The payments to this Subclass, both under the Individual Settlements and the Settlement Agreement, are proportional to the amount of time drivers worked for Comtrak.

Members of each Subclass are being treated equitably relative to other members of their Subclass. The treatment of members across both Subclasses is also equitable and provides

adequate relief because the lower compensation (on a per driver basis) paid to the Avalos/Marquez Subclass is aligned with, and reasonable in light of, the greater difficulty members of that Subclass would have in recovering further sums from Defendant through continued litigation.

## V. The Fees Motion

### A. Attorneys' Fees and Costs

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "In general, there are two methods for calculating attorney's fees: the lodestar and the percentage-of-the-fund." Van Horn v. Nationwide Prop. & Cas. Ins. Co., 436 F. App'x 496, 498 (6th Cir. 2011) (unpublished). District courts have discretion in selecting the fee amount and the method used to determine the fee. Bowling v. Pfizer, Inc., 102 F.3d 777, 779 (6th Cir. 1996). The percentage-of-the-fund method, however, tends to be favored over the lodestar approach by courts in this circuit. See Lonardo v. Travelers Indem. Co., 706 F.Supp.2d 766, 789 (N.D. Ohio 2010) (stating that "percentage of the fund has been the preferred method for common fund cases"); Sweetwater Valley Farm, Inc. v. Dean Foods Co. (In re Se. Milk Antitrust Litig.), No. 2:07-CV 208, 2018 U.S. Dist. LEXIS 131855, at *13 (E.D. Tenn. July 11, 2018) ("[T]he percentage-of-the-fund method, however, clearly

appears to have become the preferred method in common fund cases."). Regardless of the method used, the principal requirement is that the district court's fee award be "reasonable under the circumstances." Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993).

Courts in this Circuit have held that a one-third contingency fee is "within the range of fees often awarded in common fund cases, both nationwide and in the Sixth Circuit." Se. Milk, 2018 U.S. Dist. LEXIS 131855, at *15; accord Johnson v. Midwest Logistics Sys., Ltd., 2013 U.S. Dist. LEXIS 74201, at *2 (S.D. Ohio May 25, 2013) (approving 33% attorneys' fees plus an incentive award); Stanley v. U.S. Steel Co., No. 04-74654, 2009 U.S. Dist. LEXIS 114065, at *8-10 (E.D. Mich. Dec. 8, 2009) (30% award); In re Broadwing, Inc. ERISA Litig., 252 F.R.D. 369, 380 (S.D. Ohio 2006) (noting that a 23% common fund fee award is "comparable to, and indeed, well below the percentage of the recovery approved in similar cases" and collecting cases). This Court has approved larger percentage awards. In re Regions Morgan Keegan Sec., Derivative & ERISA Litig., No. 2:09-md-2009-SHM-dkv, 2013 WL 12110279, at *8 (W.D. Tenn. Aug. 6, 2013) (granting 30% fee award).

Courts employing the percentage-of-the-fund approach are not required to conduct a crosscheck using the lodestar method. Feiertag v. DDP Holdings, LLC, No. 14-CV-2643, 2016 U.S. Dist.

LEXIS 122297, at *20-21 (S.D. Ohio Sept. 9, 2016). However, doing so often aids the court in determining the reasonableness of the requested fee award. See id.

"Often, but by no means invariably," the district court's explanation of its fee award will address "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent-fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." Moulton v. U.S. Steel Corp., 581 F.3d 344, 352 (6th Cir. 2009).

Class counsel requests $950,000 in attorneys' fees, plus $41,053.25 in costs and $11,000 for the fee paid to the settlement administrator. (ECF No. 186-1 at ¶¶ 12, 29-30.) The total amount is $1,002,053.25, which is 21.1% of the gross settlement amount of $4,750,000. (Id. at ¶ 12.) Class counsel's request falls well within the range of percentages typically awarded by courts in common fund cases. See Broadwing, 252 F.R.D. at 380; Se. Milk, 2018 U.S. Dist. LEXIS 131855, at *15. The benefit provided to the plaintiff class is substantial, with average relief of more than $50,000 to the Robles Subclass and more than $1000 to the Avalos/Marquez Subclass. (ECF No. 186-3

at ¶¶ 14-15.) Representation was undertaken on a contingent fee basis. (ECF No. 186-1 at ¶ 26.) The complexity of the litigation, which implicated numerous preemption issues, involved parallel state and federal court actions, and was contested for nearly a decade, favors the requested fee award. Representative Plaintiffs' counsel's extensive experience with class action cases likewise weighs in favor of the award. (See ECF No. 186-1 at ¶ 21.) The award of $950,000, plus costs, is reasonable.

A cross-check of the requested percentage using the lodestar method confirms that the award is appropriate. Class counsel's firm invested 1564 hours of attorney time at hourly rates ranging from $625 to $1200. This produces a lodestar amount of $1,388,650.[6] Counsel's requested fee of $950,000 produces a lodestar multiplier of 0.68.

The hourly rates are higher than is typical in this district. See Adcock-Ladd v. Sec'y of Treasury, 227 F.3d 343, 350 (6th Cir. 2000) (holding that reasonable hourly rate in lodestar calculation should be based on market rates in the court's jurisdiction, rather than foreign counsel's typical rate). Even if the Court were to halve the hourly rates, however, the lodestar amount would be decreased only to $694,325, and the lodestar multiplier increased to 1.37. This higher multiplier

---

[6] Also included in this amount are 234 hours of paralegal time, billed at $250 an hour.

30

remains well within the range of values approved by courts. See, e.g., Singleton v. Domino's Pizza, LLC, 976 F. Supp. 2d 665, 689 (D. Md. 2013) (stating that multipliers in large, complicated class actions typically range from 2.26 to 4.5). Considering the contingent nature of counsel's fee award, the excellent results produced for the class, and class counsel's skill and tenacity, the fee request is reasonable.[7]

**B. Representative Plaintiffs' Incentive Awards**

Class counsel and Representative Plaintiffs request that Salvador Robles, Jorge Avalos, Jose Marquez, Carlos Barillas, and Andres Adame be granted incentive awards of $25,000 each. Incentive awards "are not uncommon, and courts routinely approve [them] to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Ross v. Jack Rabbit Servs., LLC, No. 3:14-cv-44-DJH, 2016 U.S. Dist. LEXIS 173292, at *13 (W.D. Ky. Dec. 15, 2016) (quoting Dillworth v. Case Farms Processing, Inc., No. 5:08-cv-1694, 2010 U.S. Dist. LEXIS 20446, at *17 (N.D. Ohio Mar. 8, 2010)).

---

[7] Although counsel's fee request merits approval even with a lodestar multiplier of 1.37, a more accurate assessment of the multiplier would yield a figure somewhat below 1.37 because a significant portion of counsel's work was conducted in the Eastern District of California and the California Superior Court. The reasonable hourly rate would be higher in those courts' jurisdictions.

Although district courts have expressed enthusiasm for incentive awards, the Sixth Circuit has been ambivalent. See Greenberg v. Procter & Gamble Co. (In re Dry Max Pampers Litig.), 724 F.3d 714, 722 (6th Cir. 2013) ("[T]o the extent that incentive awards are common, they are like dandelions on an unmowed lawn -- present more by inattention than by design."); id. ("Our court has never approved the practice of incentive payments to class representatives, though in fairness we have not disapproved the practice either."). The Sixth Circuit has instructed that requests for incentive awards should be "scrutinized carefully," as courts may "sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." Hadix v. Johnson, 322 F.3d 895, 897 (6th Cir. 2003).

Despite this skepticism, the Sixth Circuit has said that "there may be circumstances where incentive awards are appropriate." Id. at 898. The circuit has not laid out a general framework under which a proposed incentive award should be assessed, but district courts in this circuit consider three factors. See Jack Rabbit, 2016 U.S. Dist. LEXIS 173292, at *14. Those factors are:

> (1) the action taken by the Class Representatives to protect the interests of the Class Members and others and whether these actions resulted in a substantial

> benefit to Class Members; (2) whether the Class
> Representatives assumed substantial direct and
> indirect financial risk; and (3) the amount of time
> and effort spent by the Class Representatives in
> pursuing the litigation.

Id. (quoting In re Skechers Toning Shoe Prods. Liab. Litig., No. 3:11-MD-2308-TBR, 2013 U.S. Dist. LEXIS 67441, at *54-55 (W.D. Ky. May 10, 2013)).

In their original Fees Motion, Representative Plaintiffs supported their request for incentive awards with declarations from Plaintiffs Robles, Avalos, Marquez, and Barillas detailing their efforts in the case and estimating the hours they had spent. (ECF No. 187 at 11 (citing ECF Nos. 178-7, 178-8, 178-9, 178-10).) At the final approval hearing, the Court inquired about the absence of any declaration from Plaintiff Adame and asked that class counsel file a declaration providing counsel's own assessment of each Plaintiff's contribution to the prosecution of the case. Counsel complied by filing his declaration and that of Adame. (ECF Nos. 192, 193.) With these additional filings, the Court has sufficient information to judge the appropriateness of the requested incentive awards.[8]

---

[8] Andres Adame is not a named plaintiff in the case before this Court. (See ECF No. 177.) He has been, however, the lead plaintiff in the parallel Adame PAGA Action. (ECF No. 192 at ¶ 2.) Class counsel represents that Plaintiff Adame's efforts "supported both the class claims and the PAGA action." (Id. at ¶ 14.) The Court will refer to Adame as a Representative Plaintiff for the purposes of its incentive award analysis. At least one district court has granted an incentive award to a plaintiff who was not a named plaintiff in the action directly before the court. See In re Synchronoss Techs., Inc.

### 1. Action Taken by Representative Plaintiffs and Benefit to Class Members

Representative Plaintiffs undertook significant steps to initiate and aid the litigation. Plaintiffs Robles and Barillas independently secured counsel to bring an action on behalf of themselves and other drivers.[9] (ECF No. 192 at ¶¶ 10, 12.) Each Representative Plaintiff served as an intermediary between class counsel and drivers and gathered information and documentation to support the case. (Id. at ¶¶ 10, 12-14.) Class counsel represents that each Representative Plaintiff was "instrumental to the success of this litigation" and opines that "without their contributions the settlement now before this Court would not have been achieved." (Id. at 2, 15.) The size of the recovery, with relief in the thousands to tens of thousands of dollars per Class Member, strongly supports a high estimation of the value of Representative Plaintiffs' efforts.

### 2. Class Representatives' Direct and Indirect Financial Risk

Because class counsel litigated this case on a contingent fee basis, Representative Plaintiffs did not directly assume the

---

Stockholder Derivative Demand Refused Litig., No. 20-07150, 2021 U.S. Dist. LEXIS 238014, at *42 & n.9 (D.N.J. Dec. 13, 2021). As in this case, the plaintiff there was a named representative in a related state court action resolved as part of a global settlement. Id.

[9] Although Plaintiff Barillas originally procured representation separate from class counsel litigating the action before this Court, Barillas eventually dismissed his original suit to join this action. (ECF No. 192 at ¶ 12.)

financial risks of litigation. (ECF No. 186-1 at ¶ 26.) Representative Plaintiffs did, however, assume an indirect financial risk by publicly associating their names with lawsuits against their employers, a fact which, if discovered through a public records search, could hinder future employment. (ECF No. 192 at ¶ 17.)

### 3. Time and Effort Spent by Class Representatives in Pursuing the Litigation

Representative Plaintiffs Robles, Avalos, Marquez, and Barillas estimate the number of hours they spent on this litigation as 30, 35, "hundreds," and 336, respectively. (ECF Nos. 178-7, 178-8, 178-9, 178-10.) Representative Plaintiff Adame reports spending 40 hours plus an additional, unquantified amount of time communicating with other drivers. (ECF No. 193.) Class counsel qualifies those numbers, stating he believes that, due to their unfamiliarity with legal billing and measuring time spent on legal matters, Representative Plaintiffs underestimate or overestimate the amount of time they spent supporting the litigation. (ECF No. 192 at ¶¶ 10-15.) Counsel estimates that each Representative Plaintiff spent between 100 and 150 hours working on the case. (Id.) Given the long course of this litigation, the multiplicity of ways in which Representative Plaintiffs participated, and counsel's greater experience in accounting for legal time, ECF No. 192 at ¶¶ 10-11, 13, the Court

places greater weight on counsel's estimate of 100 to 150 hours than on the lower estimates of 30 or 35 hours. Because each Representative Plaintiff likely contributed more than 100 hours to supporting this case, a significant incentive award is appropriate, particularly given the remarkable recovery made for the class. The Court therefore approves the requested incentive awards of $25,000 for each Representative Plaintiff.

## VI. Conclusion

For the foregoing reasons, the Final Approval Motion, ECF No. 186, and the Fees Motion, ECF No. 187, are GRANTED.

The Court ORDERS that:

1. The terms in this Order shall have the meanings set forth in the Settlement Agreement, ECF No. 186-2, Ex.1.

2. The Court has jurisdiction over the subject matter of this action, the Representative Plaintiffs, the Class Members, and the Defendants.

3. The Court certifies, for purposes of settlement only, the following class and subclasses:

> **The Class:** All current and former California-based truck drivers for Defendants, at any time from January 2009, to the present (the "Class Period") and who were classified by Defendants as independent contractors.

> "California-based" refers to Drivers: (i) who had a residential address in California at any time during the Class Period; and/or (ii) who were assigned or associated with a terminal in California at any time during the Class Period.

The phrase "assigned or associated with a terminal" includes any and all Drivers listed in Defendants' database in connection with a terminal.

**The "Robles Subclass":** All class members who did not execute releases of their claims in this action on or around and after August 27, 2014.

**The "Settlement-Release Subclass" (or the "Avalos/Marquez Subclass"):** All class members who executed releases of their claims in this action on or around and after August 27, 2014.

4. For the reasons set forth in this Order, the Court enters final judgment of dismissal of the Litigation, with prejudice. The Court further approves the Settlement Agreement as fair, reasonable, in the best interest of the participating Settlement Class, and adequate in all respects to the Settlement Class, pursuant to California law and all applicable law, and orders the settling parties to consummate the Settlement in accordance with the terms of the Settlement Agreement.

5. In full compliance with the requirements of due process, on August 15, 2022, the Settlement Administrator mailed the Class Notice by first-class mail to each Class Member at that Member's last known address, based upon Defendants' business records and reasonable address verification measures.

6. The Court has determined that the Class Notice constituted valid, due, and sufficient notice to all Class

Members, and complied fully with California law, the U.S. Constitution, and any other applicable laws.

7. Due and adequate notice of the proceedings having been provided to the Class Members, and a full opportunity having been offered to them to participate in the fairness hearing, it is hereby determined that all Class Members are bound by this final approval order of the Litigation and final judgment of dismissal of the Litigation entered herein.

8. The plan of distribution, as set forth in the Settlement Agreement providing for the distribution of the Net Settlement Amount to participating Class Members, is approved as being fair, reasonable, and adequate pursuant to California law and all applicable law.

9. On entry of this final approval order of the Litigation and final judgment of dismissal of the Litigation, and by operation of this final approval order and final judgment of dismissal, the claims of each participating Settlement Class Member against Defendants are fully, finally, and forever released, relinquished, and discharged pursuant to the terms of the Settlement Agreement.

10. This final approval order and the final judgment of dismissal resolve all pending claims against Defendants in the Litigation.

11. Without further order of the Court, the parties may jointly agree to reasonable extensions of time to carry out any provisions of the Settlement Agreement.

12. Counsel's requested attorneys' fees of $950,000, plus $41,053.25 in costs and $11,000 in settlement administration costs, are approved.

13. The Court approves incentive awards of $25,000 each to Plaintiffs Salvador Robles, Jorge Avalos, Jose Marquez, Carlos Barillas, and Andres Adame, as provided in the Settlement Agreement.

14. Without affecting the finality of this order, the Court shall retain exclusive and continuing jurisdiction over the Litigation, Representative Plaintiffs, the Settlement Class, and Defendants for purposes of supervising the consummation, administration, implementation, enforcement, and interpretation of the Settlement Agreement and all other matters covered in this Order.

SO ORDERED this 14th day of December, 2022.

/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE